## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:22-cv-00222-MR-WCM

| | |
|---|---|
| ZACHARY HEBB,                ) | |
|                     ) | |
|           Plaintiff,     ) | |
|                     ) | __MEMORANDUM OF__ |
|    vs.                 ) | __DECISION AND ORDER__ |
|                     ) | |
| CITY OF ASHEVILLE, NORTH  ) | |
| CAROLINA, and BEN WOODY,  ) | |
| Individually and in his official    ) | |
| capacity,                ) | |
|                     ) | |
|          Defendants.   ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Preliminary Injunction [Doc. 3], the Defendants' Motion to Dismiss [Doc. 9], and the Plaintiff and Defendant Ben Woody's Stipulation of Dismissal of Ben Woody in his Individual Capacity [Doc. 11].

## I.  PROCEDURAL BACKGROUND

On October 20, 2022, the Plaintiff, Zachary Hebb ("Plaintiff"), initiated this action against Defendant City of Asheville ("the City") and Ben Woody. [Doc. 1].  In his Verified Complaint, the Plaintiff challenges "the constitutionality of Asheville ordinance § 10-85(2) on its face and as applied

to Hebb's oral amplified speech on public ways near [the] Asheville Health Center of Asheville, North Carolina, Inc. ('AHC') clinic."  [Id. at ¶ 1].

On October 24, 2022, the Plaintiff filed the present Motion for Preliminary Injunction.  [Doc. 3].  In his Motion, the Plaintiff seeks to enjoin the Defendants "from applying or enforcing City Ordinance § 10-85(2) to ban the use of amplification within 150 feet of [the AHC] and other medical clinics."  [Id. at 1].

On November 15, 2022, the Defendants filed a Motion to Dismiss the Plaintiff's claims in their entirety.  [Doc. 9].  On November 17, 2022, the Plaintiff filed a Stipulation of Dismissal as to Defendant Woody in his individual capacity.  [Doc. 11].

## II.     STANDARD OF REVIEW

### A.     Motion for Preliminary Injunction

A plaintiff seeking a preliminary injunction must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm absent injunctive relief, (3) the balance of the equities tips in his favor, and (4) the injunction would be in the public interest.  Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L.Ed.2d 249 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right."  Id. at 24, 129 S. Ct. at 376.   A Plaintiff seeking a preliminary injunction

"need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation marks omitted). Ultimately, a plaintiff's entitlement to preliminary injunctive relief is a matter of discretion with the Court. See Metro. Regul. Info. Sys., Inc. v. Am. Home Realty Network, Inc., 722 F.3d 591, 595 (4th Cir. 2013).

"While it is [the] Plaintiff['s] burden, as the movant[], to make a showing sufficient to justify a preliminary injunction, 'the burdens at the preliminary injunction stage track the burdens at trial.'" Harmon v. City of Norman, 981 F.3d 1141, 1147 (10th Cir. 2020) (quoting Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429, 126 S. Ct. 1211, 1219, 163 L.Ed.2d 1017 (2006)). Accordingly, when "the proponent of a challenged ordinance fails to make a sufficient showing that its regulation is constitutional, the movants will have shown a substantial likelihood that they will prevail on the merits of their claim challenging the validity of that regulation." Id.; see also Ashcroft v. ACLU, 542 U.S. 656, 666, 124 S. Ct. 2783, 2791-92, 159 L.Ed.2d 690 (2004) ("As the Government bears the burden of proof on the ultimate question of [the challenged law's] constitutionality, respondents must be deemed likely to prevail unless the

Government has shown that respondents' proposed less restrictive alternatives are less effective than [the challenged law].").

"When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party." Queen Virgin Remy, Co. v. Thomason, No.1:15-cv-1638-SCJ, 2015 WL 11422300, at *2 (N.D. Ga. June 10, 2015), modified No. 1:15-cv-1638-SCJ, 2015 WL 11455760 (N.D. Ga. Oct. 21, 2015) (citing Imaging Bus. Machs., LLC v. BancTec, Inc., 459 F.3d 1186, 1192 (11th Cir. 2006)). If the evidence is contested, however, the court must "assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." Weaver v. Henderson, 984 F.2d 11, 14 (1st Cir. 1993) (quoting Indep. Oil & Chem. Workers of Quincy, Inc. v. Proctor & Gamble Mfg. Co., 864 F.2d 927, 933 (1st Cir. 1988)).

At a preliminary injunction stage, allegations set forth in a verified complaint are treated the same as affidavits. IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537, 542 (7th Cir. 1998) (noting that "[v]erified complaints [are] the equivalent of affidavits"); Synthes USA, LLC v. Davis, No. 4:17-cv-02879-RBH, 2017 WL 5972705, at *1 n.2 (D.S.C. Dec. 1, 2017)

(explaining that "a verified complaint is wholly sufficient for purposes of ruling on a preliminary injunction motion.") (citation omitted).[1]

## B.    Motion to Dismiss

The central issue for resolving a Rule 12(b)(6) motion is whether the complaint states a plausible claim for relief.  See Francis v. Giacomelli, 588 F.3d 186, 183 (4th Cir. 2009).  In considering a defendant's motion, the Court accepts the plaintiff's allegations as true and construes them in the light most favorable to the plaintiff.  Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); Giacomelli, 588 F.3d at 190-92.

Although the Court accepts well-pled facts as true, the Court is not required to assume the truth of "bare legal conclusions."  Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011).  "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)."  Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012).

The claims need not contain "detailed factual allegations," but must contain sufficient factual allegations to suggest the required elements of a

---

[1] "In fact, the Fourth Circuit has indicated a complaint—verified or not—must be considered."  Synthes USA, 2017 WL 5972705, at *1 n.2 (citing G.G. ex. rel. Grimm v. Gloucester Cty. Sch. Bd., 822 F.3d 709, 725-26 (4th Cir. 2016), vacated and remanded on other grounds, 137 S. Ct. 1239 (2017)).

cause of action.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); see also Consumeraffairs.com, 591 F.3d at 256.  Namely, the complaint is required to contain "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; see also Consumeraffairs.com, 591 F.3d at 255.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); see also Consumeraffairs.com, 591 F.3d at 255.  The mere possibility that a defendant acted unlawfully is not sufficient for a claim to survive a motion to dismiss.  Consumeraffairs.com, 591 F.3d at 256; Giacomelli, 588 F.3d at 193.  Ultimately, the well-pled factual allegations must move a plaintiff's claim from possible to plausible. Twombly, 550 U.S. at 570, 127 S. Ct. at 1974; Consumeraffairs.com, 591 F.3d at 256.

## III.    FACTUAL BACKGROUND

The Plaintiff is a resident of Penrose, North Carolina.  [Doc. 1 at ¶ 11]. Defendant City of Asheville is alleged to be a municipal governmental

authority[2] with the authority to enact and enforce local ordinances. [Id. at ¶ 12]. Defendant Ben Woody is the former Director of the Asheville Development Services Department ("DSD"), where he was responsible for drafting, presenting, and enforcing noise ordinances in Asheville. [Id. at ¶ 13; Woody Affidavit, Doc. 7-1 at ¶ 2].

The Plaintiff is a Christian who believes that abortion "is an affront to God." [Doc. 1 at ¶¶ 14-16]. In 2019, the Plaintiff began sharing his views about abortion on public ways near the AHC in Asheville. [Id. at ¶ 17]. The AHC is a Planned Parenthood facility that functions as the sole abortion provider in Western North Carolina. [Id. at ¶ 19]. The AHC is located at 68 McDowell Street in Asheville within an area zoned for various medical facilities. [Id. at ¶ 18]. The AHC provides abortions on Thursdays and Fridays. [Id. at ¶ 153].

The Plaintiff frequently visits the public areas around the AHC on days that the clinic performs abortions as well as on other days during the week. [Id. at ¶ 26]. Occasionally, the Plaintiff holds signs or hands out literature conveying his viewpoints about abortion. [Id. ¶ 27]. However, he does not find those means of communication to be very effective because visitors

---

[2] The Court will take judicial notice of the fact that the Defendant City of Asheville is a municipal corporation.

7

"only have a brief moment to read his signs," and AHC staff and escorts direct visitors not to stop in the driveway, thereby "precluding Hebb from handing out literature." [Id.]. Oral speech is the Plaintiff's "primary and by far most effective means of communication at [the] AHC clinic," and the Plaintiff uses an amplifier when speaking on public ways near the AHC. [Id. at ¶¶ 28, 29]. The Plaintiff "tries to convince pregnant women, along with friends and family with them, not to go through with the abortion procedure[.]" [Id. at ¶ 21].

The Plaintiff prefers to convey his message through oral speech with a conversational tone. [Id. at ¶¶ 28, 30]. Although the Plaintiff can be heard without using amplification by yelling, he does not want to yell to be heard because yelling "undercuts his message and purpose." [Id. at ¶¶ 30, 167]. The Plaintiff's ability to be heard without using amplification is further hindered by music and other noise played by AHC staff and escorts through blue tooth speakers and cell phones on AHC property. [Id. at ¶¶ 168-170]. This noise from AHC staff and escorts drowns out the speech of the Plaintiff and others. [Id.].

In January of 2019, the City of Asheville began the process of amending the City's noise ordinance. [Id. at ¶ 31; Wood Affidavit, Doc. 7-1 at ¶ 3]. Accordingly, the City reviewed over eight years of noise complaint

8

data to identify common noise disturbances. [Wood Affidavit, Doc. 7-1 at ¶ 5]. As part of that review, the City "observed that an abnormally high number of noise complaints were being received in the vicinity of medical care providers located to the south of downtown Asheville" and found that it had "received 62 complaints in this geographic location, many pertaining to the use of amplified sound in the immediate vicinity of open and operating medical facilities." [Id. at ¶ 5-6]. Throughout the amendment process, DSD employees also sought feedback from members of the public. [Doc. 1 at ¶¶ 36, 41; Woody Affidavit, Doc. 7-1 at ¶¶ 16-17].

On September 23, 2019, City of Asheville staff held a noise ordinance update meeting with stakeholders believed to have an interest in the amendment process to review feedback from the Asheville community. [Doc. 1 at ¶ 42]. There, the City identified "neighbor noise/dog barking, construction noise, music over-amplification, industrial/institutional facilities and equipment, fireworks, and trash pick-up" as top noise concerns. [Id.]. On December 17, 2019, the City held another noise ordinance update meeting and identified the same top noise concerns in addition to "loud vehicle exhaust, jake braking, emergency sirens, train horns, highway traffic/construction, and airplanes/helicopters." [Id. at ¶¶ 44-46; see also Doc. 3-4 at 18-19].

9

The City posted a proposed noise ordinance for public comment between November 18, 2020 and December 11, 2020. [Doc. 1 at ¶ 50]. The proposed ordinance identified the following top noise concerns: "construction, music over-amplification (venues, outdoor events, and buskers), vehicle exhaust/revving, refuse collection, residential, commercial/industrial, fireworks, and dogs and animals." [Id. at ¶ 51]. The proposed ordinance updated the then-existing noise ordinance to clarify daytime and nighttime restrictions; establish objective decibel levels in central business, commercial, and industrial districts; establish prohibitions on jake braking and pointing speakers at residential units; establish permit requirements for music venues, outdoor events, and fireworks; alter permit requirements for construction noise; create landlord accountability for tenant noise; increase civil penalties for noise violations; and create a noise control position. [Id. at ¶ 52]. On January 26, 2021, Defendant Woody and City staff submitted a report with public feedback about the proposed noise ordinance to the Public Safety Committee. [Id. at ¶ 54]. The report did not mention concerns about amplification outside of medical clinics. [Id.].

In April of 2021, the Plaintiff exchanged emails with Defendant Woody regarding a citation he received for using amplification on a public way outside of the AHC. [Id. at ¶¶ 56-58; see also Doc. 3-6]. At that time, the

10

noise ordinance only prohibited amplification used for commercial purposes, and the citation was dropped. [Doc. 1 at ¶¶ 56, 61]. On May 25, 2021, Defendant Woody also emailed the Plaintiff decibel readings taken outside the AHC. [Id. at ¶ 63; see also Doc. 3-7]. In a subsequent telephone conversation, Defendant Woody told the Plaintiff that the City was amending the noise ordinance to incorporate decibel level requirements. [Id. at ¶¶ 66-67]. Defendant Woody further informed the Plaintiff that the City had received complaints about noise outside the AHC. [Id. at ¶ 68].

On June 1, 2021, Defendant Woody presented an updated version of the proposed noise ordinance to the Public Safety Committee for feedback. [Id. at ¶ 70]. This version of the proposed noise ordinance did not contain a prohibition on amplification around medical clinics. [Id. at ¶ 75]. Prior to the meeting, the Public Safety Committee received several comments from individuals expressing concerns about amplified noise outside the AHC. [Id. at ¶ 79; see also 3-9 at 2-8]. Some of these comments requested that the amended noise ordinance include a limitation on amplified noise outside the AHC and other medical facilities. [Doc. 1 at ¶ 79-80; see also Doc. 3-9 at 2-4, 8]. These comments did not, however, express concerns about amplified noise outside of medical facilities generally. [Doc. 1 at ¶ 79; see also Doc. 3-9].].

On June 22, 2021, Defendant Woody presented another updated version of the proposed noise ordinance to Asheville City Council. [Id. at ¶¶ 81-82]. This version of the proposed noise ordinance included a provision prohibiting amplification within 150 feet of medical clinics. [Id.; see also Doc. 3-10 at 17]. Regarding the amplification ban, Defendant Woody stated only that "[we're] proposing to prohibit amplified sound within 150 feet of a public school or a health care facility. Those are places where services are happening and quiet is important for those services." [Doc. 1 at ¶ 86].

On June 25, 2021, Defendant Woody emailed the Plaintiff stating that the City continued to receive complaints about noise outside of the AHC and asking the Plaintiff to lower his volume or stop using amplification. [Id. at ¶ 90; see also Doc. 3-11 at 1]. The Plaintiff continued to use amplification. [Doc. 1 at ¶¶ 93-113]. On June 26, 2021 and July 24, 2021, Defendant Woody issued the Plaintiff citations for noise violations under the then-existing noise ordinance. [Id. at ¶¶ 93-111; see also Doc. 3-12; Doc. 3-13].

On July 27, 2021, the Asheville City Council passed the amended noise ordinance, including the amplification ban in § 10-85(2). [Doc. 1 at ¶ 121]. The amplification ban reads as follows:

> Unless otherwise allowed by this chapter, no person shall engage in any of the following enumerated activities:

12

. . .

> (2) Producing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients.

[Id.; see also Doc. 3-15 at 4]. Although § 10-85(2) prohibits the use of amplified sound within 150 feet of the property line of an open medical clinic, it does not prohibit amplified sound emanating *from* clinic properties. [Doc. 1 at ¶¶ 172-173; see also Doc. 3-15 at 4; Doc. 3-16].

Other provisions of the amended noise ordinance impose a general, daytime sound level limitation of 65 decibels in the City's commercial district, including in the area where medical clinics and other medical facilities are located, and prohibit "noise disturbance[s] originating from a right-of-way, street or other public space." [Doc. 3-15 at 3]. Under the amended noise ordinance, a "noise disturbance" is "any sound or vibration which: (1) [m]ay disturb or annoy reasonable persons of normal sensitivities; or (2) [c]auses, or tends to cause, an adverse effect on the public health or welfare; or (3) [e]ndangers or injures people; or (4) [e]ndangers or injures personal or real property." [Id. at 2]. Some of the factors to be considered when determining whether a noise constitutes a "noise disturbance" include the volume of the noise, the frequency of the noise, and whether the noise is amplified. [Id.].

13

The amended noise ordinance, including the amplification ban in § 10-85(2), went into effect on September 15, 2021. [Doc. 1 at ¶ 122]. On September 18, 2021, a DSD official was at the AHC to enforce the amplification ban. [Id. at ¶ 127]. The official informed Allura Lightfoot, a friend of the Plaintiff's, that the City considers the AHC to be a "medical clinic" under § 10-85(2) and that the City also considers a plastic cone to be an amplifier prohibited by the amplification ban. [Id. at ¶¶ 128-131]. Lightfoot relayed this interaction to the Plaintiff. [Id. at ¶ 132].

The 150-foot zone surrounding the AHC extends into the 150-foot zone of other medical clinics in the area. [Id. at ¶¶ 136-137]. Thus, on weekdays when the other medical clinics around the AHC are open, the amplification ban extends beyond the 150-foot zone surrounding the AHC. [Id. at ¶ 138]. Traveling north on McDowell Street, the Plaintiff cannot use amplification within approximately 3,200 feet of the AHC property line. [Id. at ¶¶ 141-144]. Traveling south on McDowell Street, the Plaintiff cannot use amplification within approximately 4,900 feet of the AHC property line. [Id. at ¶¶ 145-146]. To the east, the Plaintiff cannot use amplification within approximately 1,200 feet of the AHC property line. [Id. at ¶¶ 147-149]. To the west, the Plaintiff can use amplification approximately 470 feet from the AHC property line on Choctaw Street. [Id. at ¶ 151]. However, this placement puts the Plaintiff

behind structures, where visitors to the AHC cannot see him, and his amplified speech cannot be heard over traffic. [Id. at ¶ 152].

On Saturdays, when some of the surrounding clinics are closed, the Plaintiff can use amplification to the east of the AHC at a location that sits behind the AHC on the north side of Choctaw Street.[3] [Id. at ¶¶ 154-155]. This location is closer to the AHC than the locations that are available for amplification use on weekdays. [See id.]. On Saturday, January 8, 2022, the Plaintiff attempted to use amplification at this location. [Id. at ¶ 155]. However, because visitors to the AHC usually park on the south side of the building rather than in the back of the building, this location placed the Plaintiff at least 200 feet away from his intended audience. [Id. at ¶ 156]. Further, the Plaintiff found that trees and vehicles obstructed his view of visitors going into the AHC. [Id. at ¶ 157]. On that day, a DSD official also approached the Plaintiff and informed him that nearby residents complained about the Plaintiff's amplified speech. [Id. at ¶ 162]. The official told the Plaintiff to lower his speech below 65 decibels to avoid a citation, and the Plaintiff complied. [Id. at ¶¶ 161-163]. The Plaintiff, therefore, concluded that this location is "unworkable" on Saturdays. [Id. at ¶ 164].

---

[3] The Defendants, however, assert that the Plaintiff can use amplification within 150 feet of the AHC in "virtually any direction" on weekends. [Woody Affidavit, Doc. 7-1 at ¶ 14].

## IV. DISCUSSION

### A. Motion for Preliminary Injunction

#### 1. Likelihood of Success on the Merits

The Plaintiff challenges the constitutionality of the amplification ban in § 10-85(2) on its face and as applied to him. [Doc. 1 at ¶ 1]. Specifically, the Plaintiff argues that § 10-85(2) violates "his rights to free speech and due process" under the First and Fourteenth Amendments. [Doc. 4 at 12; <u>see also</u> Doc. 1 at ¶¶ 182-189; Doc. 3 at 1].

##### a. Free Speech Claims

Sidewalks and public ways "occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." <u>McCullen v. Coakley</u>, 573 U.S. 464, 476, 134 S. Ct. 2518, 2529, 189 L.Ed.2d 502 (2014) (quoting <u>United States v. Grace</u>, 461 U.S. 171, 180, 103 S. Ct. 1702, 1708, 75 L.Ed.2d 736 (1983)). These locations are "traditional public fora" that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." <u>Id.</u>, 134 S. Ct. at 2529 (quoting <u>Pleasant Grove City v. Summum</u>, 555 U.S. 460, 469, 129 S. Ct. 1125, 1132, 172 L.Ed.2d 853 (2009)). In traditional public fora, the "government has no power to restrict expression

16

because of its message, its ideas, its subject matter, or its content," and "the government may not selectively . . . shield the public from some kinds of speech on the ground that they are more offensive than others." Id. at 477, 134 S. Ct. at 2529 (internal citations and quotation marks omitted). The government may, however, establish reasonable time, place, or manner laws provided that those laws are content neutral, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels of communication. Id., 134 S. Ct. at 2529; see also Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S. Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).

When determining whether a law is content based or content neutral, "[t]he *government's purpose* is the controlling consideration." Ward, 491 U.S. at 791, 109 S. Ct. at 2754 (emphasis added). A law is content based, not content neutral, if those enforcing it must "'examine the content of the message that is conveyed to determine whether' a violation has occurred." McCullen, 573 U.S. at 479, 134 S. Ct. at 2531 (quoting FCC v. League of Women Voters of Cal., 468 U.S. 364, 383, 104 S. Ct. 3106, 3119, 82 L.Ed.2d 278 (1984)). Further, "[g]overnment regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" Ward, 491 U.S. at 791, 109 S. Ct. at 2754 (quoting

Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293, 104 S. Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)) (emphasis added). However, a law that is facially content neutral does not become content based simply because "it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791, 109 S. Ct. at 2754. "Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to [intermediate] scrutiny." Reed v. Town of Gilbert, 576 U.S. 155, 166, 135 S. Ct. 2218, 2228, 192 L.Ed.2d 236 (2015).

The amplification ban in § 10-85(2) prohibits the use of amplification within 150 feet of the property line of an open medical clinic without reference to the content of the speech being amplified. [Doc. 3-15 at 4]. However, the Plaintiff has alleged facts and presented evidence that, at least, suggest that the Defendants enacted § 10-85(2) because they were concerned about amplified, pro-life speech outside the AHC specifically, rather than amplified speech outside of medical clinics generally. For instance, although Defendant Woody states that the City received 62 noise complaints over a period of eight years regarding amplified noise in the City's medical district, [Woody Affidavit, Doc. 7-1 at ¶¶ 5-6], nothing in the record presently before

the Court indicates whether these complaints relate to amplified noise throughout the medical district or only amplified, pro-life speech outside of the AHC. In fact, the current record shows that the specific comments submitted to the Defendants regarding amplified speech outside of medical clinics relate to amplified speech outside the AHC, and at least some of those comments object to the content of the anti-abortion protestors' speech. [Doc. 3-9]. Moreover, the Defendants introduced the amplification ban into the amended noise ordinance only after receiving these comments. [See Doc. 3-10; Doc. 1 at ¶¶ 79-81].

In addition, the scope of § 10-85(2) is inconsistent with the Defendants' purported justification for implementing the amplification ban. See March v. Mills, 867 F.3d 46, 65 (1st Cir. 2017) ("[W]hen a restriction on speech is underinclusive, there may be reason to doubt 'whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.'"). The Defendants assert that § 10-85(2) was enacted to protect patients from harmful noise. [Doc. 7 at 7-8]. Yet, the amplification ban does not apply to all amplification. Notably, § 10-85(2) prohibits only amplified sound *emanating from within 150 feet of the property line* of an open medical clinic. [Doc. 3-15 at 4]. The amplification ban does *not* apply to amplified sound emanating *from the property itself*, [see id.], and the City

allows staff members and escorts at the AHC to play amplified noise on the clinic's property, [Doc. 1 at ¶¶ 169-173; see also Doc. 3-15 at 4; Doc. 3-16]. The Defendants do not, however, offer any explanation as to why amplified noise originating from the clinic's property is any less harmful for patients than amplified noise originating from within 150 feet of the clinic's property line.

Similarly, § 10-85(2) applies only to "medical clinics."  [Doc. 3-15 at 4]. The term "medical clinic" is undefined in the noise ordinance.  [See Doc. 3-15].  Accordingly, the Court must look to the "ordinary meaning" of the term. United States v. George, 946 F.3d 643, 645-46 (4th Cir. 2020) (citing FCC v. AT&T Inc., 562 U.S. 397, 403, 131 S. Ct. 1177, 1182, 179 L.Ed.2d 132 (2011)).  A "clinic" is a medical facility for the treatment of outpatients.  *Clinic*, MERRIAM-WEBSTER (last visited Jan. 3, 2023), https://www.merriam-webster.com/dictionary/clinic ("a facility (as of a hospital) for diagnosis and treatment of outpatients."); *Clinic*, DICTIONARY.COM (last visited Jan. 3, 2023), https://www.dictionary.com/browse/clinic ("a place, as in connection with a medical school or a hospital, for the treatment of nonresident patients, sometimes at low cost or without charge.").  Therefore, the amplification ban in § 10-85(2) seemingly does not apply to inpatient medical facilities, such as the inpatient units of a hospital or inpatient rehabilitation centers, where

patients may be staying overnight or require a longer period of recovery. Yet, the Defendants again fail to explain why amplified noise is so harmful to patients' recovery that it warrants an amplification ban outside of outpatient medical clinics but is simultaneously not sufficiently harmful enough to warrant a similar ban outside of inpatient medical facilities.

Taken together, these facts raise questions about whether the Defendants' purported, content-neutral justification for the enactment of § 10-85(2) is genuine. Rather, these facts tend to suggest that the City was specifically concerned about amplified anti-abortion speech emanating from public ways outside of the AHC rather than amplified speech disturbing patients at medical facilities generally or even all amplified speech around the AHC disturbing AHC patients. However, even if § 10-85(2) was enacted with a content neutral justification, the amplification ban still fails even intermediate scrutiny because it is not narrowly tailored to serve the Defendants' purported interest in protecting patients from harmful noise, and it does not leave open ample alternative channels of communication as applied to the Plaintiff.

A content neutral time, place, or manner restriction must be narrowly tailored to serve a significant government interest. <u>Ward</u>, 491 U.S. at 791; 109 S. Ct. 2753. The Fourth Circuit has instructed that "'common sense and

the holdings of prior cases' [are] sufficient to establish the existence" of a significant government interest. Billups v. City of Charleston, 961 F.3d 673, 685 (4th Cir. 2020) (quoting Reynolds v. Middleton, 779 F.3d 222, 227 (4th Cir. 2015)). "[W]hen it is obvious that a challenged law serves a significant governmental interest, [the Fourth Circuit] do[es] not require that the government produce evidence so demonstrating." Billups, 961 F.3d at 685 (quoting Reynolds, 779 F.3d at 228 n.4). The Supreme Court has recognized that the government has a significant interest in controlling noise around hospitals and medical facilities. Madsen v. Women's Health Center, Inc., 512 U.S. 753, 772, 114 S. Ct. 2516, 2528, 129 L.Ed.2d 593 (1994) ("Noise control is particularly important around hospitals and medical facilities during surgery and recovery periods . . . The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.").

The amplification ban in § 10-85(2) is narrowly tailored to serve the Defendants' purported interest in protecting patients from harmful noise so long as the Defendants' interest "would be achieved less effectively absent the regulation" and the government does "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Ward, 491 U.S. at 799, 109 S. Ct. at 2758; see also

McCullen, 573 U.S. at 486, 134 S. Ct. at 2535 (explaining that a content neutral restriction is narrowly tailored when it does not "burden substantially more speech than is necessary to further the government's legitimate interests."). However, a content neutral regulation "'need not be the least restrictive or least intrusive means of' serving the government's interests." McCullen, 573 U.S. at 486, 134 S. Ct. at 2535 (quoting Ward, 491 at 798, 109 S. Ct. at 2757). "To prove that a content-neutral restriction on protected speech is narrowly tailored to serve a significant governmentmental interest, *the government must, inter alia, present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it.'"* Billups, 961 F.3d at 688 (quoting McCullen, 573 U.S. at 494, 134 S. Ct. at 2539) (emphasis added). Therefore, "the government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." Id.

Here, the scope of the amplification ban in § 10-85(2) is not narrowly tailored to address the Defendants' purported interest in protecting recovering patients from harmful noise. As previously noted, the amplification ban does not apply to amplification emanating from medical clinics' properties, and it seemingly does not apply to inpatient medical

23

facilities, where patients may stay overnight or need longer recovery periods. The Defendants offer no explanation as to why amplification emanating from medical clinics' properties or amplification outside of inpatient medical facilities is any less harmful or disruptive to patient recovery than amplification emanating from within 150 feet of medical clinics' property lines. Thus, the amplification ban seemingly does not address large portions of the problem it purports to solve. This is particularly true considering that the amplified sound produced by clinic employees would appear to be for the purpose of drowning out the Plaintiff's amplified sound. As such, it would appear that the amplified sound within the property would be louder and thus more disturbing for patients, except to the extent that this provision, as applied, is *intended* to be directed at the *content* of the Plaintiff's message, rather than its disturbing volume.

In other respects, the amplification ban is too broad because it applies to all amplified speech within 150 feet of the property line of a medical clinic without regard as to whether that amplified speech is disruptive to patient care. The Defendants rely on the Eleventh Circuit's decision in Pine v. City of West Palm Beach and the Eastern District of North Carolina's decision in O'Connell v. City of New Bern to argue that the amplification ban in § 10-85(2) is narrowly tailored. In O'Connell, the Eastern District of North Carolina

held that an ordinance prohibiting "loud, raucous and disturbing noise" and prohibiting the use of devices that amplify sound such that the sound "is clearly audible more than 100 feet from the device" did not violate the First Amendment.  O'Connell v. City of New Bern, 447 F. Supp. 3d 466, 473, 480 (E.D.N.C. 2020) (finding that the ordinance was narrowly tailored because it set "a 100-foot noise limitation" and noting that the plaintiffs "were not prohibited from using the megaphone at a lower volume").  The decision in O'Connell does not support the Defendant's argument.  Rather, it illustrates the defect in § 10-85(2).  The ordinance in O'Connell used distance as a metric for measuring how disturbing the volume of the amplified sound is.  In the present case, amplified sound of a *lower* volume from outside the property would be in violation, while sound of a *higher* volume coming from within the clinic property would be allowed.  As such, O'Connell shines a light on how § 10-85(2) is intended to regulate sound based on who was producing it and its content.

In Pine, the Eleventh Circuit held that protestors were not likely to succeed on their claim that a city ordinance banning shouting and amplified sound within 100 feet of the property line of a health care facility violated their First Amendment rights.  Pine v. City of West Palm Beach, 762 F.3d 1262, 1275 (11th Cir. 2014).  The Eleventh Circuit construed the ordinance

narrowly "as targeting only loud, raucous, or unreasonably disturbing noise" because other provisions of the city's code suggested that the City of West Palm Beach was concerned with that category of noise. Id. at 1271-75. At the same time, the Eleventh Circuit instructed that "grave constitutional questions would arise were we to interpret the [ordinance] to prohibit all devices that in any way electronically produce or increase the volume of sound. Thus, for example, if a passerby carries on a subdued telephone conversation, the sound from her cellphone has negligible or no effect on patient health." Id. at 1270.

Once again, the limitation in the construction of the ordinance in Pine illustrates the shortcoming of § 10-85(2). The amplification ban in § 10-85(2) does not state that a particular *type* or *volume* of amplified speech is prohibited. For example, the amplification ban does not prohibit only amplified speech that is unreasonably disturbing or that can be heard from a specified distance. Instead, the ordinance's plain language imposes a total ban on "[p]roducing, or causing to be produced amplified sound within 150 feet of the property line of . . . a medical clinic that is open or otherwise caring for patients." [Doc. 3-15 at 4]. In other words, § 10-85(2) prohibits precisely the sort of sound that the Court in Pine determined was beyond the scope of the ordinance at issue there. There, the Court opined that the ordinance

26

would raise "grave constitutional questions" if constructed as § 10-85(2) is drafted.

Other provisions of the amended noise ordinance impose a sound level limitation of 65 decibels in the City's commercial district and establish various factors, including the use of amplification, for determining whether a sound causes a "noise disturbance" on a public right-of-way. [Id. at 3]. That provision must read in conjunction with § 10-85(2). See Discover Bank v. Vaden, 396 F.3d 366, 369 (4th Cir. 2005) ("It is a classic canon of statutory construction that courts must 'give effect to every provision and word in a statute and avoid any interpretation that may render statutory terms meaningless or superfluous.'"). As such, § 10-85(2) can be read only as a comprehensive ban on amplified sound, even that below the 65 decibel threshold, if within 150 feet of the clinic property, regardless of whether it is of a volume such to disturb any clinic patients. As such, the amplification ban in § 10-85(2) is likely to be found overly broad. Reading these provisions together, § 10-85(2) is precisely the sort of limitation that the Court in Pine would hold to be unconstitutional. Someone carrying on a telephone conversation on a speakerphone while walking by a clinic, or playing a car radio while driving by, would be in violation.

Notably, the amended noise ordinance's decibel limitation or noise disturbance standard are insufficient to address the City's stated interest in protecting patients from harmful, amplified noise outside of medical clinics. In fact, the Defendants took decibel readings and issued two citations to the Plaintiff on June 26, 2021 and July 24, 2021, before the amplification ban became effective, because Defendant Woody determined that the volume of the Plaintiff's amplified speech constituted a noise disturbance under the previous noise ordinance. [Doc. 1 at ¶¶ 93-113; Doc. 3-12; Doc. 3-13]. Despite previously employing decibel readings and noise disturbance factors to address amplified speech and introducing new objective decibel limitations, the Defendants have failed to present any evidence as to why these provisions are inadequate, requiring a ban on outside amplification, but only outside amplification.

A content neutral time, place, or manner restriction must also "leave open ample alternative channels of communication." Ward, 491 U.S. at 802, 109 S. Ct. at 2760. "[T]o satisfy this standard, the available alternatives need not 'be the speaker's first or best choice' or 'provide [] the same audience or impact for the speech.'" Ross v. Early, 746 F.3d 546, 559 (4th Cir. 2014). "Rather, the relevant inquiry is simply whether the challenged regulation provides avenues for the more general dissemination of a message." Id.

(internal quotation marks omitted).  Here, the Plaintiff has alleged facts showing that the amplification ban in § 10-85(2) does not leave open ample alternative channels of communication as applied to the Plaintiff.

The Plaintiff asserts that, on weekdays when clinics near the AHC are open and operating, he cannot use amplification from within approximately 3,200 feet of the AHC property line in the northern direction, approximately 4,900 feet of the AHC property line in the southern direction, approximately 1,200 feet of the AHC property line in the eastern direction, and approximately 470 feet of the AHC property line in the western direction, where visitors to the AHC cannot see him or hear him over traffic.  [Doc. 1 at ¶¶ 138-151].  The Defendants argue that these distances are of no consequence because the Plaintiff is able to hold signs, distribute literature, and speak without amplification within the amplification-free zone, [Doc. 7 at 14-15], those methods of communication are largely inadequate to communicate the Plaintiff's message.  Visitors "only have a brief moment to read his signs, if they see them at all," and escorts and staff at the AHC direct visitors not to stop in the driveway, preventing the Plaintiff from handing out literature.  [Doc. 1 at ¶ 27].  The Plaintiff also believes that an essential part of his message is in its delivery, and he seeks "to be winsome and speak conversationally."  [Id. at ¶ 30].  However, without amplification, the Plaintiff

cannot be heard over the amplified music and noise played by AHC staff and escorts without shouting, which undercuts the purpose of his intended message. [Id. at ¶¶ 166-170]. Therefore, the Plaintiff has alleged facts showing that, as applied to him, the amplification ban in § 10-85(2) does not leave the Plaintiff with ample alternative channels to communicate his message.

For all these reasons, on the record presently before the Court, the Plaintiff is likely to succeed on the merits of his first cause of action alleging that the amplification ban in § 10-85(2) violates his rights under the First Amendment.

### b. Due Process Claim

The Plaintiff argues that the amplification ban in § 10-85(2) is also unconstitutionally vague because the Defendants interpret § 10-85(2) as prohibiting the use of plastic cones in addition to electronic amplification devices. [See Doc. 1 at ¶¶ 187-189, Doc. 4 at 23-24].

"To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement." Manning v. Caldwell for City of Roanoke, 930 F.3d 264, 272 (4th Cir. 2019). However, "[t]he degree of vagueness tolerated in a law

depends in part on the type of statute." Id. "Less clarity is required in purely civil statutes because the 'consequences of imprecision are qualitatively less severe.'" Id. (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S. Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)).

Here, the amplification ban in § 10-85(2) is purely civil, and the amended noise ordinance imposes civil penalties for violations. [Doc. 3-15 at 9]. The amplification ban prohibits "amplified sound" within 150 feet of the property line of an open medical clinic. [Id. at 4]. The amended noise ordinance does not, however, define what constitutes "amplified sound." [See id. at 1-4]. Thus, the Court looks to the ordinary meaning of the term "amplify." George, 946 F.3d at 645-46. To "amplify" a sound is to make it louder or stronger. See Amplify, MERRIAM-WEBSTER (last visited Jan. 3, 2023), https://www.merriam-webster.com/dictionary/amplify ("to make larger or greater (as in amount, importance, or intensity)" and "to increase the strength or amount of[.] especially: to make louder"); see also Amplify, DICTIONARY.COM (last visited Jan. 3, 2023), https://www.dictionary.com/browse/amplify ("to make larger, greater, or stronger; enlarge; extend.").

The parties disagree about whether a plastic cone produces "amplified sound" in violation of the amended noise ordinance. [See Doc. 4 at 23; Doc.

7 at 18-19].  The Defendants offer no argument explaining why plastic cones are amplification devices or how plastic cones produce the "amplified sound" prohibited by § 10-85(2).  Whether using a plastic cone *amplifies* sound by making it louder or stronger or merely *directs* sound in a certain direction presents a complex evidentiary question rooted in physics, and, therefore, it is unclear to people of ordinary intelligence whether § 10-85(2) applies to plastic cones.  Accordingly, the Plaintiff has demonstrated a likelihood of success on his due process claim.

### 2. Irreparable Harm

The Supreme Court's "frequently reiterated standard requires [a plaintiff] seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."  Winter, 555 U.S. at 22, 129 S. Ct. at 375.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough."  Roe v. Dep't of Def., 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase, 872 F.3d at 230) (internal quotation marks and alteration omitted).  "[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011) (quoting Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L.Ed.2d 547 (1976)).  Further,

"monetary damages are inadequate to compensate for the loss of First Amendment freedoms." Id. (quoting Joelner v. Vill. of Wash. Park, 378 F.3d 613, 620 (7th Cir. 2004)). Here, the Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief because the amplification ban in § 10-85(2) effectively undercuts his purpose for speaking, which is to speak conversationally with those visiting the AHC to get an abortion.

### 3. Balance of Equities

A plaintiff seeking a preliminary injunction must establish that the balance of the equities tips in his favor. Winter, 555 U.S. at 20, 129 S. Ct. at 374. "[I]n each case the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc., No. 17-cv-00150-MR-DLH, 2017 WL 3838638, at *1 (W.D.N.C. Sept. 1, 2017) (Reidinger, J.) (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542, 107 S. Ct. 1396, 1402, 94 L.Ed.2d 542 (1987)).

Here, while the Plaintiff is likely to suffer irreparable harm because the amplification ban in § 10-85(2) prevents him from speaking conversationally with those visiting the AHC to get an abortion, the Defendants are not harmed by the issuance of a preliminary injunction preventing the enforcement of a speech restriction that is likely to be found unconstitutional.

See Newsome v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) ("With respect to the harm that would befall if an injunction were put in place, Jouett is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional."); see also Legend Night Club, 637, F.3d at 302-03 ("[T]he State of Maryland is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions."). Further, the Defendants have other, less-speech-restrictive methods in place to address concerns about harmful noise outside of medical clinics, including the amended noise ordinance's decibel restriction and noise disturbance standard. Accordingly, the balance of the equities tips in the Plaintiff's favor.

### 4. Public Interest

A plaintiff seeking a preliminary injunction must establish that the granting of an injunction is in the public interest. Winter, 555 U.S. at 20, 129 S. Ct. at 374. "[U]pholding constitutional rights is in the public interest." Legend Night Club, 637 F.3d at 303. Because the Plaintiff has demonstrated a likelihood of success on his claims that the amplification ban in § 10-85(2) violates his rights to free speech and due process, this factor also weighs in favor of the Plaintiff.

In sum, the Plaintiff has demonstrated a likelihood of success on the merits of his claim that § 10-85(2) is overly broad and unconstitutionally vague and that such constitutional infirmities burden the Plaintiff's rights to free speech and due process to a degree greater than necessary to serve the Defendants' purported interest in protecting patients from harmful noise.[4] The Plaintiff has further demonstrated that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of the equities tips in the Plaintiff's favor; and that the imposition of a preliminary injunction would be in the public interest. Accordingly, the Plaintiff's motion for preliminary injunctive relief is granted.

## B. Motion to Dismiss

The Defendants move to dismiss the Plaintiff's Verified Complaint in its entirety. [Doc. 9].

With respect to the Plaintiff's claims against Defendant City of Asheville and Defendant Woody in his official capacity and for the reasons articulated in the Court's analysis of the Plaintiff's Motion for Preliminary Injunction, the Court finds that the Plaintiff's Verified Complaint states plausible claims that

---

[4] Although it appears at this juncture that there is a content-based purpose behind § 10-85(2), the Court offers no opinion as to whether that factor contributes or even causes the provision to be unconstitutional. The Defendants' manner of seeking to effectuate that purpose is sufficient to hold that the Plaintiff is likely to prevail in this constitutional challenge.

the amplification ban in § 10-85(2) violates the Plaintiff's free speech and due process rights. Accordingly, the Defendants' Motion to Dismiss is denied with respect to the Plaintiff's claims against Defendant City of Asheville and Defendant Woody in his official capacity.

Further, the Plaintiff and Defendant Woody stipulate and agree that the Plaintiff's claims against Defendant Woody in his individual capacity may be dismissed. [Doc. 11]. Accordingly, the Court dismisses the Plaintiff's claims against Defendant Woody in his individual capacity, and the Defendants' Motion to Dismiss is denied as moot with respect to the Plaintiff's claims against Defendant Woody in his individual capacity.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Preliminary Injunction [Doc. 3] is **GRANTED,** and the Defendants are hereby enjoined from enforcing § 10-85(2) during the pendency of this action.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Dismiss [Doc. 9] is **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiff's claims against Defendant Ben Woody in his individual capacity are **DIMMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

Signed: February 8, 2023

Martin Reidinger
Chief United States District Judge