# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:22-cv-00222-MR-WCM

| | |
|---|---|
| ZACHARY HEBB, )<br><br>Plaintiff, )<br><br>vs. )<br><br>CITY OF ASHEVILLE, NORTH )<br>CAROLINA, and BEN WOODY, )<br>individually and in his official )<br>capacity, )<br><br>Defendants. )<br>_____ ) | **MEMORANDUM OF**<br>**DECISION AND ORDER** |

**THIS MATTER** is before this Court on Defendants' Motion to Dismiss as Moot and Motion to Dissolve Injunction [Doc. 21] and Plaintiff's Motion for Summary Judgment [Doc. 25].

## I.     PROCEDURAL BACKGROUND

Zachary Hebb ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983 by filing his Verified Complaint against the City of Asheville ("Asheville" or the "City") and Ben Woody ("Woody") (collectively

"Defendants"), on October 20, 2022.[1]  [Doc. 1].  Plaintiff alleged in his Complaint that the version of Asheville Ordinance § 10-85(2) (the "First Amplification Ban" or the "First Ban") that was then in existence violated his free speech and due process rights under the United States Constitution. [Id. at 31].  On October 24, 2022, Plaintiff moved for entry of a preliminary injunction and on November 15, 2022, Defendants filed a motion to dismiss. [Docs. 3; 9].  After these motions were briefed, this Court entered an Order on February 8, 2023, enjoining Defendants from enforcing the First Amplification Ban and denying their motion to dismiss.  [Doc. 14]. Defendants filed their Answer on February 22, 2023.  [Doc. 15].

On August 22, 2023, the City amended the First Amplification Ban and other portions of its noise ordinance.  [See Doc. 21 at 2 ¶ 4].  This Court will refer to the amended ban as either the "Second Amplification Ban" or the "Second Ban."  Defendants then filed another motion to dismiss on October 13, 2023, arguing that the amendments to the noise ordinance had cured any constitutional deficiencies and thereby had mooted this matter.  [Id. at

---

[1] Woody was initially sued individually and in his official capacity as Asheville's Director of Development Services.  [See Doc. 1].  However, on November 17, 2022, Plaintiff filed a stipulation pursuant to Rule 41 of the Federal Rules of Civil Procedure seeking to dismiss his individual capacity claims against Woody.  [See Doc. 11].  Those claims were dismissed without prejudice on February 8, 2023.  [See Doc. 14].

2

3]. Plaintiff responded on October 27, 2023, arguing that the Second Amplification Ban is still unconstitutional, and Defendants replied on November 3, 2023. [Docs. 22; 23]. While this motion was pending, on November 15, 2023, Plaintiff filed a motion for summary judgment seeking to permanently enjoin Defendants from enforcing the Second Amplification Ban, as well as nominal damages. [Doc. 25]. More specifically, Plaintiff contends that Defendants should be permanently enjoined from enforcing the Second Ban because it violates his free speech rights under the Constitution. [See Doc. 25-1 at 15]. He also argues that he is entitled to nominal damages because the First Amplification Ban was unconstitutionally vague and thereby violated his rights protected by the Fourteenth Amendment's Due Process Clause. [See id. at 24]. Defendants responded on November 29, 2023, and Plaintiff replied on December 6, 2023. [Docs. 26; 27]. As these motions have been fully briefed, they are ripe for disposition.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss for Mootness

Defendants' motion to dismiss this case as moot is properly considered pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, as they contend that this Court no longer has subject matter jurisdiction over this

3

dispute. See Stone v. Trump, 400 F. Supp. 3d 317, 333-34 (citing CGM, LLC v. BellSouth Telecomm's, Inc., 664 F.3d 46, 52 (4th Cir. 2011)). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Off. English v. Arizona, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). If at any point during the litigation "an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit," Genesis Healthcare Corp. v. Symczyk, 569 U.S. 66, 72 (2013), or if "the issues presented are no longer 'live[,]'" the court is deprived of jurisdiction and the action must be dismissed as moot. See Holloway v. City of Virginia Beach, 42 F.4th 266, 273 (4th Cir. 2022).

## B. Summary Judgment

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-

4

48 (1986); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). This Court does not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden shifts to the nonmoving party to demonstrate that a triable issue exists. Id. When considering a motion for summary judgment, the pleadings and materials presented must be viewed in the light most favorable to the non-movant, and all reasonable inferences must be drawn in the non-movant's favor. Adams v. UNC Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

5

## III.  FACTUAL BACKGROUND

The relevant facts here are not in dispute.  Plaintiff is a resident of Penrose, North Carolina, and Asheville is a municipal corporation.  [Docs. 1: Verified Complaint at ¶ 11; 14: Order at 7 n.2; 15: Answer at ¶¶ 11-12].  Woody is the former Director of Asheville's Development Services Department ("DSD").  [Docs. 1 at ¶ 13; 7-1: First Woody Aff. at ¶ 2; 15 at ¶ 13].  As such, he was responsible for drafting, presenting, and enforcing Asheville's noise ordinance.  [Id.].

Plaintiff is a Christian who believes that abortion "is an affront to God." [Doc. 1 at ¶¶ 14-16].  In 2019, he began sharing his views regarding abortion on public ways near the Asheville Health Center ("AHC"), a Planned Parenthood facility that provides abortions.  [Id. at ¶¶ 17, 19].  The AHC is located at 68 McDowell Street in Asheville, an area zoned for various medical facilities, and is open Tuesday through Saturday.  [Id. at ¶ 18; Docs. 15 at ¶ 18; 25-3: Hebb Aff. at ¶ 101].  Plaintiff frequently visits the AHC, trying "to convince pregnant women . . . not to go through with the abortion procedure[.]"  [Doc. 1 at ¶¶ 21, 26].  He uses an amplifier to speak with individuals entering the AHC from the nearby public ways.  [Id. at ¶ 29].  Staff and escorts working at the AHC frequently play music and other noise with

6

Bluetooth speakers and cell phones to drown out the sounds of protests outside the clinic. [Id. at ¶¶ 168-70; see also Docs. 25-12; 25-28].

In January of 2019, Asheville began the process of updating its noise ordinance, hoping to "shift toward more objective standards" that are "easier to enforce[.]" [Docs. 1 at ¶ 31; 7-1: First Woody Aff. at ¶¶ 3-4; 15 at ¶ 31]. As part of this process, the City reviewed over eight years of noise complaint data. [Doc. 7-1 at ¶ 5]. The City "observed that an abnormally high number of noise complaints were being received in the vicinity of medical care providers located to the south of downtown Asheville" and found that it had "received 62 complaints in this geographic location, many pertaining to the use of amplified sound in the immediate vicinity of open and operating medical facilities." [Id. at ¶¶ 5-6]. During the amendment process, DSD employees sought feedback from members of the public. [Docs. 1 at ¶¶ 36, 41; 7-1 at ¶¶ 16-17; 15 at ¶ 36].

On September 23, 2019, the City held a noise ordinance update meeting with stakeholders believed to have an interest in the amendment process. [Docs. 1 at ¶ 42; 15 at ¶ 42]. At this meeting, the City identified "nuisance dog barking," "construction," "industrial/institutional facilities & equipment," "music over-amplification: venues, buskers, outdoor events," "fireworks," and "early morning trash pick-up" as areas of concern. [See Doc.

7

25-5 at 18]. On December 17, 2019, the City held a second update meeting, at which it added "lawnmowers/leaf blowers" as an area of concern. [See Doc. 25-6 at 18].

The City posted a proposed updated noise ordinance for public comment between November 18, 2020 and December 11, 2020. [Docs. 1 at ¶ 50; 15 at ¶ 50]. The proposed ordinance would update the then-existing noise ordinance to: clarify daytime and nighttime restrictions; establish objective decibel levels in central business, commercial, and industrial districts; establish prohibitions on jake braking and pointing speakers at residential units; establish permit requirements for music venues, outdoor events, and fireworks; alter permit requirements for construction noise; create landlord accountability for tenant noise; increase civil penalties for noise violations; and create a noise control position. [Docs. 1 at ¶ 52; 15 at ¶ 52]. On January 26, 2021, Woody and other City staff members provided the Public Safety Committee with an update regarding community feedback on the proposed ordinance. [Docs. 1 at ¶ 54; 15 at ¶ 54].

On February 2, 2021, Gwen Wisler ("Wisler"), a member of Asheville's City Council, met with AHC staff members Kathrin Lewis and McCoy Faulkner, as well as Nikki Harris ("Harris"), Planned Parenthood South Atlantic's Director of Philanthropy for Western North Carolina. [See Doc. 25-

8

8].  After this meeting, Harris sent Wisler an email containing links to videos taken of protestors outside the AHC on the previous Saturday; a document outlining Planned Parenthood's "legal questions about noise/picketing/parking"; an account from a volunteer claiming that she had been assaulted by a protestor at the clinic the previous Saturday; a list of "CONCERNS FROM THIS PAST WEEKEND," which included "Zach on the ladder on very high volume"; and thanking her for her support of Planned Parenthood.  [Id.].  Wisler forwarded this email to Asheville's City Manager, asking "how we can be responsive . . . [.]"  [Id.].

In April of 2021, Plaintiff exchanged emails with Woody regarding a citation he previously received for using amplification on a public way outside the AHC.  [Docs. 1 at ¶¶ 56-57; 15 at ¶¶ 56-57; see also Doc. 3-6: Email Exchange].  As it then existed, the City's noise ordinance only prohibited amplification used for commercial purposes, so the citation was dismissed. [Id.].  On May 25, 2021, Woody emailed Plaintiff decibel readings the City had taken outside the AHC.  [Docs. 1 at ¶ 63; 15 at ¶ 63; see also Doc. 3-7: Email Exchange].  In a subsequent telephone conversation, Woody told Plaintiff that the City was amending its noise ordinance to incorporate decibel level requirements and that it had received complaints about noise outside the AHC.  [Docs. 1 at ¶¶ 66-68; 15 at ¶¶ 66-68].

During the week prior to May 27, 2021, Wisler sent Harris a proposed addendum to Asheville's noise ordinance, which would ban the use of amplified sound around medical clinics. [See Doc. 25-1 at 5; 25-9: Email Exchange at 5]. On May 27, Harris emailed Woody, "pass[ing] along" Wisler's proposed ban, and asking whether there was "anything Planned Parenthood c[ould] do to facilitate the addendum to the noise ordinance . . . [.]" [Doc. 25-9 at 4-5]. On May 28, Woody responded, stating, "I would very much like to include the language you passed along – I think it makes enforcement in these areas much easier for city staff, and provides much needed sound relief to certain land uses." [Id. at 4]. He continued, "I previously checked in with our Legal department and they are supportive of the concept, with some minor wording changes. . . . [M]y recommendation is to add this type of language to the final draft ordinance." [Id.].

Also on May 28, 2021, Woody called Plaintiff and "informed [him] of the volume of complaints the City was receiving regarding the use of amplified sound near medical facilities . . . ." [Docs. 1 at ¶ 68; 15 at ¶ 68]. Woody also discussed the "noise ordinance amendment process" with Plaintiff during this call. [Docs. 1 at ¶ 67; 15 at ¶ 67]. However, Woody did not mention that the City was considering adopting an amplification ban or that he had decided to recommend it do so. [Doc. 25-3: Hebb Aff. at ¶ 40].

On June 1, 2021, Woody presented another updated version of the proposed noise ordinance to the Public Safety Committee for feedback. [Docs. 1 at ¶ 70; 15 at ¶ 70]. This version did not contain an amplification ban, nor did Woody's presentation specifically address concerns regarding amplified sound around medical clinics. [Docs. 1 at ¶¶ 72-80; 15 at ¶¶ 72-80]. However, prior to the meeting, the Public Safety Committee received several comments from individuals expressing concerns about the protests outside the AHC. [Docs. 1 at ¶ 79; 15 at ¶ 79; see also Docs. 3-9: Public Comments; 25-12: Public Comments]. Some commenters limited their complaints to the noise volume of the protests outside the AHC, but others complained about the protestors' message. [See Docs. 3-9; 25-12]. None of the comments in the record regarding amplified noise specifically mention any medical facility other than the AHC. [See id.].

After this meeting, on June 2, 2021, Harris emailed Woody, asking him to "confirm that the additional language was added" to the ordinance that was approved by the Public Safety Committee. [Doc. 25-9: Email Exchange at 3]. Woody responded the same day, stating that "[t]he Public Safety Committee recommended moving the ordinance forward to the full council[,]" that he "intend[ed] to add the . . . language to the forthcoming draft ordinance[,]" and that he would be sure to let Harris know "if any flags c[a]me

11

up[.]" [Id.]. Harris emailed Woody again on June 9, 2021, checking to see if the draft ordinance language had been updated and asking when it would be considered by the City Council. [Id. at 2]. Woody responded the same day, stating that "[t]he draft ordinance is not ready yet, but Legal is working on the language we previously discussed[,]" and informing Harris that the City Council had scheduled a hearing on the ordinance for June 22, 2021. [Id.]. On June 21, Harris emailed Woody again, stating that she "wanted to check on the status of the proposed noise ordinance[,]" and asking if the hearing was still scheduled for June 22. [Id. at 1]. Woody responded the same day, stating, "no hearing tomorrow, just a presentation. That said, I am including a slide that recommends the non-amplification limitation we discussed." [Id.].

On June 22, 2021, Woody presented yet another updated version of the noise ordinance to the City Council. [Docs. 1 at ¶¶ 81-82; 15 at ¶¶ 81-82]. This proposal included, for the first time, the language of the First Amplification Ban, which when enacted, would prohibit the use of amplified sound within 150 feet of the property lines of open medical clinics and schools. [Id.; see also Doc. 3-10 at 17]. "DSD staff worked with the City of Asheville City Attorney's Office in order to tailor a provision similar to that from Charlotte's ordinance regarding amplified sound in sensitive areas" and the City reviewed "dozens of exemplar noise ordinances from across the

12

state and region" before finalizing its proposal regarding the First Amplification Ban. [Doc. 7-1: First Woody Aff. at ¶¶ 9-10, 15]. However, in presenting the First Ban to the City Council, Woody stated only that "we [a]re proposing to prohibit amplified sound within 150 feet of a public school or a health care facility. Those are places where services are happening and quiet is important for those services." [Docs. 1 at ¶ 86; 15 at ¶ 86]. No member of the Council mentioned the proposed First Ban during the meeting. [Docs. 1 at ¶ 88; 15 at ¶ 88].

On June 25, 2021, Woody emailed Plaintiff stating that the City continued receiving complaints about noise outside the AHC and asking Plaintiff to lower his volume or to stop using amplification. [Docs. 1 at ¶ 90; 15 at ¶ 90; <u>see also</u> Doc. 3-11 at 1]. Woody did not mention that the City was considering adopting the First Amplification Ban. [Docs. 1 at ¶ 91; 15 at 91]. Plaintiff continued using amplification, and on June 26, 2021, and July 24, 2021, Woody issued him citations for creating noise disturbances under the noise disturbance standard that was then in existence. [Docs. 1 at ¶¶ 93-113; 15 at ¶¶ 96, 98-108, 110-13; <u>see also</u> Docs. 3-12: June 26 Citation; 3-13: July 24 Citation]. Woody did not mention that the City was considering adopting the First Ban during either interaction. [Docs. 1 at ¶¶ 108, 113; 15 at ¶¶ 108, 113].

13

On July 27, 2021, the Asheville City Council amended the City's noise ordinance and enacted the First Amplification Ban. [Docs. 1 at ¶ 121; 15 at ¶ 121]. The First Ban took effect on September 15, 2021, and read as follows:

> Unless otherwise allowed by this chapter, no person shall engage in any of the following enumerated activities:
>
> …
>
> (2) Producing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients.

[Doc. 3-15 at 4].

Another provision of the amended ordinance imposed a general daytime sound level limitation of 65 decibels in the City's commercial district, including in the area where medical clinics and other medical facilities are located. [Id. at 3]. Under this limitation, amplified sound emanating from *within* the AHC's property lines may not exceed 65 decibels, but amplification from within the property was not otherwise limited by the First Ban. [See Doc. 25-28]. The amended noise ordinance also maintained the provisions prohibiting "noise disturbance[s] originating from a right-of-way, street or other public space." [Doc. 3-15 at 3]. A "noise disturbance" is defined as

14

"any sound or vibration which: (1) [m]ay disturb or annoy reasonable persons of normal sensitivities; or (2) [c]auses, or tends to cause, an adverse effect on the public health or welfare; or (3) [e]ndangers or injures people; or (4) [e]ndangers or injures personal or real property."  [Id. at 2].  Some factors that may be used in considering whether an individual has created a noise disturbance include the volume of the noise, the frequency of the noise, and whether the noise is amplified.  [Id.].

On September 18, 2021, a DSD official went to the AHC to enforce the First Amplification Ban.  [Docs. 1 at ¶ 127; 15 at ¶ 127; 25-3: Hebb Aff. at ¶ 71].  The official informed Allura Lightfoot, Plaintiff's friend, that the City considers the AHC to be a "medical clinic" and that it also considers plastic cones to be prohibited amplifiers.  [Docs. 1 at ¶¶ 128-31; 15 at ¶¶ 128-31; 25-3 at ¶¶ 73-75].  Lightfoot relayed this to Plaintiff.  [Docs. 1 at ¶ 132; 25-3 at ¶ 76].  There is no indication in the record that Plaintiff ever used a plastic cone to speak outside the AHC.  However, he asserts that his speech was chilled when Lightfoot informed him of the City's enforcement efforts and about their interpretation of the First Ban.  [Doc. 25-3 at ¶¶ 73-77].  He further asserts that he would have used a cone outside of the AHC, "numerous times[,]" but for fearing that he would be cited or arrested if he violated the First Ban.  [Id. at ¶ 141].

15

Plaintiff filed this suit against the City on October 20, 2022, and he moved for entry of a preliminary injunction enjoining the City from enforcing the First Amplification Ban on October 24, 2022. [Docs. 1, 3]. After this Court granted Plaintiff preliminary injunctive relief on February 8, 2023, as discussed above, on August 22, 2023, the City again amended its noise ordinance. [Doc. 21-1: Second Woody Aff. at ¶¶ 4-9]. Specifically, the City adopted three "non-substantive" "clarifying amendments" to the ordinance, [id.], including adopting the following definitions for the terms "medical clinic" and "amplified sound":

> *Medical Clinic* means any location where one or more "health care providers," as that term is defined in N.C. Gen. Stat. § 90-21.11, provide their services, without regard to whether such services are provided on an inpatient or outpatient basis.
>
> *Amplified Sound* means a sound augmented by any electronic or other means that increases the sound level or volume.

[Doc. 25-29]. The amplification ban was also amended, and the Second Amplification Ban, which the City now seeks to enforce, reads as follows:

> Unless otherwise allowed by this chapter, no person shall engage in any of the following enumerated activities:
>
> …

(2) Producing, or causing to be produced amplified sound within 150 feet of the property line of a public school where classes or other educational activities are occurring, or a medical clinic that is open or otherwise caring for patients. For purposes of clarity, it is expressly noted that this prohibition does not apply to sounds originating from public schools or medical clinics themselves, as such sounds are already subjected to decibel limitations under section 10-83 of the City Code.

[Id.].

## IV.  DISCUSSION

### A.  Defendants' Motion to Dismiss for Mootness

"[O]rdinarily, 'statutory changes that discontinue a challenged practice' are enough to render a case moot . . . ."  Holloway, 42 F.4th at 273 (quoting Valero Terrestrial Corp. v. Paige, 211 F.3d 112, 116 (4th Cir. 2000)). However, a defendant cannot "moot a case by repealing the challenged statute and replacing it with one that differs only in some insignificant respect."  Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 662 (1993); Holloway, 42 F.4th at 273 (quoting Esposito v. S.C. Coastal Council, 939 F.2d 165, 171 (4th Cir. 1991)) ("not every tweak to a challenged statute will [moot a case]; 'minor and insignificant' changes that do not address the essence of a plaintiff's claims will not forestall legal challenges to the . . . statute.").

17

After the preliminary injunction was entered, the City adopted three "non-substantive, clarifying" amendments to its noise ordinance. [See Doc. 21-1: Second Woody Aff. at ¶¶ 4-6]. As noted above, these amendments defined the terms "amplified sound" and "medical clinic," and noted "[f]or purposes of clarity" that the ban "does not apply to sounds originating from . . . medical clinics." [See Doc. 25-9]. These changes are "minor and insignificant," and do not address the essence of Plaintiff's free speech claim because the Second Amplification Ban still prohibits the use of amplified sound within 150 feet of open medical clinics, just as the First Ban did. [Compare Docs. 3-15; 25-29]. Accordingly, Plaintiff may proceed with his free speech challenge to the Second Amplification Ban. Therefore, Defendants' motion to dismiss for mootness is denied.[2]

---

[2] Additionally, although Plaintiff concedes that the Second Amplification Ban is no longer unconstitutionally vague, as a result of the City defining the term "amplified sound," [see Doc. 25-1 at 24], he may nevertheless be entitled to damages if he proves that the First Amplification Ban was unconstitutionally vague and that it chilled his speech. See McClean v. City of Alexandria, 106 F. Supp. 3d 736, 738 (E.D. Va. 2015) ("[R]epealing the Ordinance does not moot McClean's as-applied challenge to the Ordinance for which he seeks nominal damages. . . . The justiciable issue that remains is whether impermissible chilling of McClean's First Amendment rights did in fact occur, and whether McClean is entitled to nominal damages as a result.") (citing Rock for Life-UMBC v. Hrabowski, 411 F. App'x 541, 550 (4th Cir. 2010)).

**B. Plaintiff's Motion for Summary Judgment**

    **1. Free Speech Claim**

The Free Speech Clause states that the government "shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. Amend. I. However, "[i]t is a fundamental principle, long established, that the freedom of speech . . . does not confer an absolute right to speak . . . ." Gitlow v. New York, 268 U.S. 652, 666 (1925). The First Amendment "protects speech along a spectrum," meaning that speech "receive[s] different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." Fusaro v. Cogan, 930 F.3d 241, 248 (4th Cir. 2019); Stuart v. Camnitz, 774 F.3d 238, 244 (4th Cir. 2014).

Sidewalks and public ways "occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate." McCullen v. Coakley, 573 U.S. 464, 476 (2014) (quoting United States v. Grace, 461 U.S. 171, 180 (1983)). These locations are "traditional public fora" that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Id. (quoting Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009)).

19

"[T]he government's ability to restrict speech in such locations is 'very limited.'"  Id. at 477 (quoting Grace, 461 U.S. at 177).

Content-based regulations in these locations are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).  However, the government enjoys "somewhat wider leeway to regulate features of speech unrelated to its content." McCullen, 573 U.S. at 477.  Specifically, content-neutral time, place, and manner laws will be upheld if they are narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication.  See id.; see also Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).  Speech regulations are "content based if [they apply] to particular speech because of the topic discussed or the idea or message expressed.  This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." Reed, 576 U.S. at 163.

Here, both the First and Second Amplification Bans would prohibit the use of amplification within 150 feet of the property line of an open medical clinic without reference to the content of the speech being amplified.  [See

20

Docs. 3-15 at 4; 25-29]. Thus, both versions of the ban are facially content neutral.

However, "[t]he Supreme Court has rejected any 'formalistic approach to evaluating content neutrality that looks only to the terms of a regulation[.]'" Cent. Radio Co. Inc. v. City of Norfolk, 776 F.3d 229, 235 (4th Cir. 2015) (quoting Hill v. Colorado, 530 U.S. 703, 719-20 (2000)). Indeed, regulations that are facially content neutral "will be considered content-based" where they "were adopted . . . because of disagreement with the message [the speech conveys]." Reed, 576 U.S. at 164 (quoting Ward, 491 U.S. at 791) (internal quotation marks omitted). "The government's purpose is the controlling consideration." Ward, 491 U.S. at 791; Hill, 530 U.S. at 719.

The Court concluded at the preliminary injunction stage that Plaintiff presented evidence suggesting that Defendants enacted the First Amplification Ban because they were concerned about amplified pro-life speech outside the AHC specifically, rather than amplified speech outside of medical clinics generally. [See Doc. 14 at 18]. However, because Plaintiff is now moving for summary judgment, the evidence must be viewed in the light most favorable to Defendants as the non-moving parties, see Adams, 640 F.3d at 556, and the question is whether the forecast of evidence presented would allow a reasonable trier of fact to conclude that Defendants

21

enacted the ban for a content neutral purpose.[3]  See Ballengee, 968 F.3d at 349.

In their forecast, the Defendants present Woody's bare assertion that "[i]n adopting [the First Amplification Ban] . . . the City was in no way motivated by a desire to prevent the Plaintiff from expressing his views regarding the [AHC] or its patients" and that the ban was adopted to "protect medical patients from harmful noise prior to, during, and after the performance of medical procedures."  [Doc. 26-1: Third Woody Aff. at ¶¶ 7-8].  Some of the evidence of record supports these assertions.  For instance, the City received 62 noise complaints regarding "amplified sound in the immediate vicinity of open and operating medical facilities" during the eight-year period before it adopted the First Ban.  [See Docs. 1: Verified Complaint at ¶ 86; 7-1: First Woody Aff. at ¶¶ 5-6; 15: Answer at ¶ 86].  "[T]he majority of [these] complaints . . . pertained to the use of amplified sound, not the message of the speech being amplified, or the motivations of the speaker."  [Doc. 7-1 at ¶ 12].   When Woody presented the First Amplification Ban to

---

[3] In discussing whether the amplification ban is content-based, the Court focuses on the First Ban because, as explained above, the City merely adopted the Second Ban to address the constitutional issues that Plaintiff raised at the preliminary injunction stage of this litigation.   There is no indication in the record that Defendants' substantive motivations for the First and Second Bans differed.

the City Council, he stated that it would apply outside of medical clinics because "[t]hose are places where services are happening and quiet is important for those services." [Docs. 1 at ¶ 86; 15 at ¶ 86]. Woody's remarks clearly relate to the sound level of the activities outside medical facilities, and no specific reference was made to the AHC or to the content of the pro-life protestors' message. All of this suggests that the City enacted the First Ban to address the complaints regarding the *sound level* of activities outside of medical clinics.

However, simply presenting a forecast that the City intended to fulfill a content-neutral purpose is insufficient to survive summary judgment. The current (Second) Amplification Ban can only be upheld if it is narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication.[4] See McCullen, 573 U.S. at 477; Ward, 491 U.S. at 791.

"'[C]ommon sense and the holdings of prior cases' [are] sufficient to establish the existence" of a significant government interest. Billups v. City of Charleston, 961 F.3d 673, 685 (4th Cir. 2020) (quoting Reynolds v.

---

[4] The Court will specifically address whether the Second Amplification Ban is narrowly tailored because Plaintiff has moved to permanently enjoin Defendants from enforcing this version of the ban. However, the First and Second Bans do not materially differ with regard to their proscriptive effect on speech.

Middleton, 779 F.3d 222, 227 (4th Cir. 2015)).  The Supreme Court has recognized that "[n]oise control is particularly important around hospitals and medical facilities during surgery and recovery periods[.]"  See Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 772 (1994).  Thus, a reasonable trier of fact could reasonably conclude that Defendants have a significant interest in controlling noise around medical facilities.

To establish that the Second Amplification Ban is narrowly tailored, however, Defendants must show that their interest in protecting patients from harmful noise "would be achieved less effectively absent the regulation," and that the ban does "not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."  Ward, 491 U.S. at 799; see also McCullen, 573 U.S. at 486 (explaining that a content neutral restriction is narrowly tailored when it does not "burden substantially more speech than is necessary to further the government's legitimate interests.").  It has long been recognized that the First Amendment does not guarantee the "[o]pportunity to gain the public's ears by *objectionably* amplified sound," or by amplified sound that is "*loud and raucous*[.]"  See Kovacs v. Cooper, 336 U.S. 77, 87-89 (1949) (emphasis added).  However, "restrictions on volume must be *no greater than necessary* to prevent disturbance from loud and raucous noise."  See U.S.

24

Lab. Party v. Pomerleau, 557 F.2d 410, 412 (4th Cir. 1977) (emphasis added); see also Pine v. City of W. Palm Beach, Fla., 762 F.3d 1262, 1271 (11th Cir. 2014) (upholding amplification ban only after concluding other provisions of noise ordinance allowed ban to be construed as "targeting only loud, raucous, or unreasonably disturbing noise"); Costello v. City of Burlington, 632 F.3d 41, 44-47 (2d Cir. 2011) (holding that noise ordinance banning "loud or unreasonable noise" that "disturbs, injures or endangers the peace or health of another . . . or [the] welfare of the community" is narrowly tailored). Moreover, the mere fact that some may abuse the privilege of communicating via amplified sound is not a sufficient ground for proscribing its use entirely. See Saia v. People of N.Y., 334 U.S. 558, 562 (1948) ("But to allow the police to bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise.").

Here, the Second Amplification Ban prevents the use of any amplified sound within 150 feet of an open medical clinic's property line, and it broadly defines "amplified sound" as meaning "sound augmented by *any* electronic or other means that increases the sound level or volume." [See Doc. 25-29 (emphasis added)]. By its terms, the ban plainly applies without regard to the volume of the sound, or to whether the sound is *actually* loud, disruptive,

or raucous.[5]  Indeed, as written, the Second Ban is broad enough to prohibit citizens from playing music quietly on their telephones or by using speakerphone to take calls within 150 feet of open clinics.  In fact, this provision is so broad as to prohibit listening to one's car radio while passing a medical clinic on a public street.  This sort of sweeping restriction proscribes far more speech than is necessary to accomplish Defendants' stated goal of protecting recovering patients from *harmful* noises.  The Second Amplification Ban on its face is thus overbroad.[6]

Additionally, although "the First Amendment imposes no freestanding 'underinclusiveness limitation,'" "a law's underinclusivity raises a red flag[.]" Williams-Yulee v. Fla. Bar, 575 U.S. 433, 449 (2015) (quoting R.A.V. v. St. Paul, 505 U.S. 377, 387 (1992)).  Regarding the narrow tailoring inquiry, underinclusivity suggests "that a law does not actually advance a compelling

---

[5] Additionally, as the City specifically defined the term amplified sound so broadly, and because there is no language in the ordinance suggesting a narrower interpretation, the Court cannot construe the ordinance narrowly to avoid the constitutional issues that Plaintiff has raised.

[6] Defendants argue that the Second Ban is narrowly tailored because it only applies to amplified sound, does not prohibit the use of amplified sound around churches, and only applies when medical clinics and schools are open.  [See Docs. 7-1: First Woody Aff. at ¶ 28; 26 at 11-12].  While this may be some evidence that Defendants could have proscribed *even more* speech, this does not undermine the conclusion that the Second Ban "burden[s] substantially more speech than is necessary to further the government's legitimate interests."  McCullen, 573 U.S. at 486.

26

interest." Id. at 448-49. Underinclusivity is particularly problematic "when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest *in a comparable way*." Id. at 451 (citing Fla. Star v. B.J.F., 491 U.S. 524, 540 (1989)).

Here, the Second Amplification Ban entirely prohibits the use of any amplified sound—regardless of how loud—within 150 feet of the property lines of open medical clinics. [See Doc. 25-29]. However, its prohibition expressly does not apply to amplified sound of comparable, or even greater, volume emanating from medical clinics themselves. [See id.]. Indeed, under the Second Ban, the employees of medical clinics may produce amplified sound inside medical clinics, even when in close proximity to recovering patients. Employees of the AHC are apparently aware of this distinction, as they have used amplified sound on the clinic's property to drown out the sounds of protests outside. [Doc. 1 at ¶¶ 168-70; see also Docs. 25-12; 25-28]. This suggests that at times the amplified sound emanating from within the AHC has been even *louder*, and thereby more harmful to recovering patients, than the noise generated by protests outside the clinic. Nonetheless, the Second Amplification Ban plainly allows for this usage to continue. This underinclusivity suggests that the ban does not substantially

27

advance Defendants' stated interest in protecting recovering patients from noise of a harmful volume.

Further, "[t]o prove that a content-neutral restriction on protected speech is narrowly tailored . . . , the government must . . . present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools . . . .'" Billups, 961 F.3d at 688 (quoting McCullen, 573 U.S. at 494). Here, by tailoring two separate regulations that allow amplified sound *from* a clinic for the purpose of drowning out sound from off the property, the City's actions suggest that there is a content-based purpose to these differing standards.[7] "[T]he government is obliged to demonstrate that it actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest." Id. "The government's burden in this regard is satisfied only when it presents 'actual evidence supporting its assertion[s].'" Id. (citing Reynolds, 779 F.3d at 229). It cannot meet this burden merely by having its officials testify that such alternatives would be ineffective. Id. ("In response, the City maintains that all three alternatives

---

[7] Such purpose can further be gleaned from the enactment of the First Ban itself, which focused only on clinics such as the AHC, but *not* on hospitals or other healthcare facilities where patients would be convalescing.

would fail . . . .  To corroborate this contention, however, the City merely offers testimony from its officials regarding the predicted ineffectiveness of the suggested alternatives.  Such testimony, without more, is not sufficient to satisfy the evidentiary standards established by Reynolds and McCullen.").

There is no forecast of evidence before this Court from which a reasonable trier of fact could conclude that Defendants seriously undertook to address the issue of excessive noise around medical clinics with less intrusive measures before resorting to a complete ban.  To the contrary, the record is uncontradicted that Defendants first became interested in addressing the problems posed by amplified sound around medical clinics when Councilmember Wisler met with representatives of the AHC on February 2, 2021.  [See Doc. 25-8: Email from Wisler].  Defendants' first proposal addressing the issue thereafter was the First Amplification Ban. [See Doc. 25-9 at 5].

Specifically, the first indication in the record that Defendants were contemplating acting is a May 27, 2021, email in which Harris "passed along" to Woody the "language" of the First Amplification Ban that she had received from Wisler earlier that week.  [Id. at 4-5].  By the very next day, Woody

decided to recommend that the City adopt the ban.[8]  [Id. at 4].  There is no indication in the record that either Wisler or Woody considered less restrictive alternatives before this point.  Moreover, when Woody presented the First Ban to the City Council, there was no discussion of less restrictive measures. In fact, aside from Woody stating that the ban around medical clinics was being proposed because "[t]hose are places where services are happening and quiet is important for those services[,]" the ban was not mentioned. [Docs. 1 at ¶ 86; 15 at ¶ 86].  As such, there is no forecast of evidence before this Court from which a reasonable trier of fact could conclude that Defendants considered less-speech-restrictive alternatives before proposing and adopting a total off-property amplification ban.

Moreover, Plaintiff has suggested that Defendants could have used at least two less restrictive alternatives to effectively address their concerns regarding amplified sound around medical clinics.  First, the version of the City's noise ordinance in existence prior to adoption of the First Amplification Ban already allowed Defendants to cite individuals for using amplified sound

---

[8] When Woody responded to Harris on May 28, 2021, he also stated that he had "previously checked in with our legal department" regarding the amplification ban and that "they are supportive of the concept, with some minor wording changes."  [Doc. 25-9 at 4]. There is no evidence in the record, however, regarding when Woody spoke with the City's legal department, nor about the legal department's role in formulating, enacting, and enforcing the amplification ban.

around medical clinics when they created noise disturbances. Moreover, this standard specifically allowed Defendants to consider the use of amplified sound as a factor in determining whether an individual had created a noise disturbance. Defendants have presented no evidence regarding their efforts to enforce the noise disturbance standard and as such, they have not demonstrated that this standard was insufficient to address their concerns regarding amplified sound around medical clinics. See Casey v. City of Newport, 308 F.3d 106, 120 (1st Cir. 2002) (holding that amplification ban was not narrowly tailored because "the record was devoid of any explanation of why the alternative of enforcing the City's noise ordinance . . . would not have achieved the City's objective as effectively as the amplification ban, while placing a substantially lesser burden on speech").

To the contrary, the only evidence in the record suggests that Defendants were *already* using the noise disturbance standard to address their concerns, and that their enforcement efforts were having their desired effect. Indeed, Woody issued Plaintiff two citations when his use of amplified sound created noise disturbances outside of the AHC on June 26, 2021, and July 24, 2021, and he issued Chris Smith a citation when his use of amplified sound created a noise disturbance outside of the AHC on June 26, 2021. [Doc. 25-3: Hebb Aff. at ¶¶ 54, 58]. Plaintiff asserts that receiving these

citations deterred him from using loud amplified sound outside the AHC thereafter.  [Id. at ¶ 66].

As a second alternative, Plaintiff contends that Defendants could have regulated sound around medical clinics by using fixed decibel limits—the same tool they use to regulate amplified sound emanating from the medical clinics themselves.  This would have allowed Defendants to limit the volume of amplified sound outside the AHC to the level they apparently determined was appropriate within the clinic, 65 decibels, without banning its use entirely.  Either alternative would seemingly allow Defendants to address the issue of amplified sound around medical clinics, yet, at the time they enacted the First Ban, Defendants offered no explanation for why they were rejected.  Indeed, as noted above, there is no forecast of evidence from which a reasonable fact finder could conclude that they even discussed these alternatives.

A year after Plaintiff filed this action, Woody for the first time sought to explain why these alternatives were inadequate.  These explanations, however, came too late, as "myriad post-hoc justifications" are insufficient to meet the City's burden of demonstrating that it "seriously undertook" to consider less-speech-restrictive alternatives *before* enacting the ban. Billups, 961 F.3d at 689 (quoting McCullen, 573 U.S. at 494).

32

Moreover, even if this Court were to consider Woody's explanations, as noted above, his testimony that the City believed that these alternatives would be ineffective, "without more, is not sufficient to satisfy the evidentiary standards established by <u>Reynolds</u> and <u>McCullen</u>." <u>Id.</u> at 688. Indeed, Woody merely asserts that the City rejected enforcing the noise disturbance standard because the use of amplified sound persisted around medical clinics despite the standard's existence, and that the City rejected fixed decibel limits because the "transient nature of noise" creators within rights of way makes it difficult to measure the volume of the noise they create. [Doc. 21-1: Second Woody Aff. at ¶¶ 11-12]. As discussed above, however, Defendants have presented no evidence suggesting that they were broadly enforcing the noise disturbance standard around medical clinics and that the problem was persisting despite their efforts, nor have they presented any evidence that they ever considered using fixed decibel limits to address the issue. This Court "cannot simply accept the City's assurances that th[e]se [alternatives] would be too difficult to enforce or would not sufficiently safeguard its interest in protecting" recovering patients from harmful noises. <u>Billups</u>, 961 F.3d at 689. This is particularly true where the City found such standard to be adequate and enforceable within the premises of such clinics.

33

On these forecasts of evidence, a reasonable trier of fact could find that the Defendants have undertaken a thinly veiled and very clumsy attempt to dress up a content-based regulation as a content-neutral regulation designed for the protection of patients. The Defendants' motivation, however, is not the issue and does not create a genuine issue of fact for trial. Rather, on the undisputed facts the ordinance in question is both constitutionally overbroad and underinclusive. Thus, there is no genuine issue of *material* fact, and the Plaintiff is entitled to summary judgment.

In sum, the Second Amplification Ban is overbroad in effect and underinclusive in application. Additionally, Defendants have not presented a forecast of evidence that they considered less-speech-restrictive alternatives prior to banning the use of all amplified sound outside of medical clinics, nor have they adequately explained why the alternatives Plaintiff suggests would be insufficient to address the issue. Therefore, for all these reasons, this Court concludes as a matter of law that the Second Ban is not narrowly tailored in accord with the Constitution. Accordingly, Plaintiff's motion for summary judgment is granted as to his free speech claim.

## 2. Due Process Claim

Plaintiff alleges that the First Amplification Ban was unconstitutionally vague insofar as Defendants applied it to prohibit him from speaking through

a plastic cone within 150 feet of an open medical clinic.[9]  [See Docs. 1 at ¶¶ 81-89; 25-1 at 24].  He further argues that this vagueness chilled his speech and therefore that he is entitled to nominal damages.[10]  [Doc. 25-1 at 24].

Where a plaintiff makes an as-applied challenge, the Court must consider "whether a statute is vague as applied to the particular facts at issue[.]"  Holder v. Humanitarian Law Project, 561 U.S. 1, 18 (2010).  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable

_____

[9] In response to Plaintiff's motion for summary judgment, Defendants argue that the Second Amplification Ban satisfies the "clarity and specificity requirements" of the due process clause because it defines "amplified sound."  [See Doc. 26 at 15-16].  This argument, however, entirely overlooks that Plaintiff has limited his vagueness challenge to Defendants' application of the First Ban.  Indeed, Plaintiff concedes that the Second Amplification Ban does not violate his rights under the due process clause of the Fourteenth Amendment.  [See Docs. 25 at 1; 25-1 at 24].  As such, this Court need not—and will not—decide whether the Second Ban satisfies the requirements of due process.

[10] Plaintiff does not allege, nor has he presented a forecast of evidence from which a reasonable trier of fact could conclude, that he ever used a plastic cone to communicate his message.  However, for purposes of standing to bring a vagueness challenge, a plaintiff can establish that he has suffered a "sufficiently imminent injury in fact [by demonstrating] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and [that] there exists a credible threat of prosecution thereunder.'"  Kenny v. Wilson, 885 F.3d 280, 288 (4th Cir. 2018) (citing Babbitt v. Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  Here, Plaintiff's speech activities clearly implicate the First Amendment.  Moreover, Plaintiff forecasts evidence that he would have used a plastic cone to speak outside the AHC, "numerous times," but for the fear of receiving a citation under the First Ban, and that a City Official informed a friend of his, who then relayed that information to him, that the City considered the use of a plastic cone to be proscribed by the First Ban.  [Doc. 25-3 at ¶¶ 74, 141].  Defendants have not contradicted this evidence.  As such, Plaintiff has standing to pursue has vagueness challenge.

35

opportunity to understand what [speech] it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill, 530 U.S. at 732; see also Manning v. Caldwell, 930 F.3d 264, 272 (4th Cir. 2019) ("To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement."). However, "[t]he degree of vagueness tolerated in a law depends in part on the type of statute." Manning, 930 F.3d at 272. "Less clarity is required in purely civil statutes because the 'consequences of imprecision are qualitatively less severe.'" Id. (quoting Hoffman Ests. v. Flipside, Hoffman Ests., Inc., 455 U.S. 489, 499 (1982)). "In contrast, laws imposing 'criminal penalties' or 'threaten[ing] to inhibit the exercise of constitutionally protected rights' are subject to 'a stricter standard.'" Carolina Youth Action Project; D.S. *ex rel.* Ford v. Wilson, 60 F.4th 770, 781 (4th Cir. 2023) (quoting Hoffman Ests., 455 U.S. at 499). The "test of vagueness applies with particular force in review of laws dealing with speech." Hynes v. Mayor & Council of Oradell, 425 U.S. 610, 620 (1976); see also Wilson, 60 F.4th at 781; Edgar v. Haines, 2 F.4th 298, 316 (4th Cir. 2021).

Here, the First Amplification Ban prohibited the use of "amplified sound" within 150 feet of the property line of an open medical clinic. [See

Doc. 3-15 at 1-4]. However, it did not define "amplified sound." Thus, Plaintiff contends that his speech was chilled when Defendants unexpectedly determined that plastic cones were amplifiers and communicated that their use outside of the AHC would violate the First Ban.[11] Therefore, the dispositive question regarding Plaintiff's as-applied vagueness challenge is whether a person of ordinary intelligence would understand the use of a plastic cone to amplify sound.

As noted above, the First Ban did not define "amplified sound"; thus, this Court must look to the ordinary meaning of that term. United States v. George, 946 F.3d 643, 645-46 (4th Cir. 2020) (citing FCC v. AT&T Inc., 562 U.S. 397, 403 (2011)). The term "amplify" is commonly defined as to make a sound louder or stronger. See Amplify, MERRIAM-WEBSTER (last visited Jan. 29, 2024), https://www.merriam-webster.com/dictionary/amplify ("to make larger or greater (as in amount, importance, or intensity)" and "to increase the strength or amount of[.] especially: to make louder"); see also Amplify, DICTIONARY.COM (last visited Jan. 29, 2024), https://www.dictionary.com/browse/amplify ("to make larger, greater, or stronger; enlarge; extend.").

_____

[11] More specifically, Plaintiff asserts that "for well over a year" he refrained from speaking with a plastic cone at the AHC "for fear of citation or arrest." [Doc. 25-3 at ¶¶ 141-42].

Based on the ordinary meaning of the term, the Court does not find that a person of ordinary intelligence would necessarily understand the use of a plastic cone to make a sound "louder or stronger." As the Court explained in its Order granting the Plaintiff a preliminary injunction:

> Whether using a plastic cone *amplifies* sound by making it louder or stronger or merely *directs* sound in a certain direction presents a complex evidentiary question rooted in physics, and, therefore, it is unclear to people of ordinary intelligence whether § 10-85(2) applies to plastic cones.

[Doc. 14 at 32]. Accordingly, the Court will grant summary judgment in favor of the Plaintiff on his due process claim and will award him nominal damages, as requested.

## C. Permanent Injunction

A plaintiff seeking permanent injunctive relief must establish the following four factors:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MerExchange, LLC, 547 U.S. 388, 391 (2006); Wudi Indus. (Shanghai) Co., Ltd. v. Wong, 70 F.4th 183, 190 (4th Cir. 2023). "The

decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." eBay Inc., 547 U.S. at 391.

"[I]t is well established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury[,]'" Legend Night Club v. Miller, 637 F.3d 291, 302 (4th Cir. 2011) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)), and that "monetary damages are inadequate to compensate for the loss of First Amendment freedoms." Id. (quoting Joelner v. Vill. of Washington Park, 378 F.3d 613, 620 (7th Cir. 2004)). Moreover, "upholding constitutional rights[,]" such as Plaintiff's free speech rights, "is in the public interest." Id. at 303 (quoting Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002)). Accordingly, having demonstrated that the Second Amplification Ban violates his constitutional right to free speech, Plaintiff has established eBay factors one, two, and four—that he has suffered an irreparable injury, for which he cannot be adequately compensated by monetary damages, and that the public interest would not be harmed by the entry of an injunction.

Regarding the third eBay factor, "the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" Armento v. Asheville

Buncombe Cmty. Christian Ministry, Inc., No. 1:17-cv-00150-MR-DLH, at *1 (W.D.N.C. Sept. 1, 2017) (Reidinger, J.) (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987)).  Here, Plaintiff has demonstrated that he has suffered irreparable harm because the Second Ban violates his free speech rights.  In contrast, the Defendants have not demonstrated that any patients will be harmed by the issuance of a permanent injunction preventing the Defendants from enforcing the unconstitutional ban.  See Newsome v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) ("With respect to the harm that would befall if an injunction were put in place, Jouett is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional."); see also Legend Night Club, 637 F.3d at 302-03 ("[T]he State of Maryland is in no way harmed by issuance of an injunction that prevents the state from enforcing unconstitutional restrictions.").  Further, as discussed above, there are other, less-speech-restrictive, alternatives that will allow Defendants to address the concern about harmful noise outside of medical clinics by means that are not unconstitutional.  As such, Plaintiff has demonstrated that the balance of hardships weighs in favor of protecting the Plaintiff's rights, as there is no other way to vindicate those rights other than by a permanent injunction.

In sum, Plaintiff has demonstrated each of the four eBay factors. Thus, in its discretion, this Court will grant Plaintiff's request for permanent injunctive relief and will permanently enjoin Defendant from enforcing the Second Amplification Ban.

## ORDER

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Dismiss as Moot and Motion to Dissolve Injunction [Doc. 21] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [Doc. 25] is **GRANTED**, and the Plaintiff is hereby awarded nominal damages in the amount of One Dollar with respect to his due process claim.

**IT IS FURTHER ORDERED** that the Defendants City of Asheville, North Carolina, and Ben Woody, along with their agents, officials, servants, employees, and all persons in active concert or participation with them or any of them, are here permanently enjoined from enforcing the Second Amplification Ban, which is contained in § 10-85(2) of the City's Code of Ordinances.

The Clerk of Court is respectfully instructed to enter a Judgment consistent with this Order contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: March 25, 2024

Martin Reidinger
Chief United States District Judge